## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>EGAN MARINE CORPORATION, *in personam*, MOTOR VESSEL LISA E, *in rem*, TANK BARGE EMC-423, *in rem,*<br><br>    Defendants. | |
| EGAN MARINE CORPORATION,<br><br>   Defendant/Third-<br>   Party Plaintiff,<br><br>  v.<br><br>EXXON MOBIL CORPORATION and EXXONMOBIL OIL CORPORATION,<br><br>  Third-Party Defendants. | Case No. 08 C 3160<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Before the Court are four motions, two of which are dispositive: (1) Defendant/Third Party Plaintiff Egan Marine Corporation's (hereinafter, "EMC") Motion to Dismiss; (2) EMC's Motion to Strike Plaintiff United States of America's (hereinafter, the "Government") Expert Witnesses; (3) Third-Party Defendants

Exxon Mobil Corporation and ExxonMobil Oil Corporation's (hereinafter, "Exxon") Motion for Summary Judgment; and (4) EMC's Motion to Strike Portions of Exxon's Statement of Material Facts.

## I.  BACKGROUND

In 1996, Exxon and Clark Oil Trading Company ("Clark Oil") entered into a contact under which Exxon sold Clarified Slurry Oil ("CSO") to Clark Oil.  EMC, which is based in Lemont, Illinois, transported CSO from Exxon's refinery in Joliet, Illinois, to Clark Oil.  On January 18, 2005, EMC's tanker barge EMC-423 arrived at the Joliet refinery to accept a load of CSO for delivery to Clark Oil.  Although Exxon intended to load the EMC-423 with CSO from Storage Tank 516, the cold winter weather caused the valve on this tank to malfunction.  This forced Exxon to transfer the CSO from Tank 516 to Tank 515.  A dispute exists between Exxon and EMC whether the characteristics of the CSO changed during this transfer.  EMC argues that the CSO loaded onto the EMC-423 became contaminated with more than 10,000 gallons of gasoline, while Exxon contends that the cargo fell within the variances allowed in the CSO refining process.  Under the Exxon-Clark Oil contract, SGS, an independent inspector, tested the quality and quantity of the CSO loaded onto the EMC-423.

After Exxon finished loading approximately 14,000 barrels of CSO on board the EMC-423 from Tank 515, it released the barge from its dock at 6:15 a.m. on January 19, 2005. Later that day, as the barge moved up the Chicago Sanitary Ship Canal propelled by the Lisa E motor vessel, its cargo of CSO exploded, which caused the barge to sink. Alexander Oliva ("Oliva"), a crew member on the Lisa E working on the EMC-423, died in the explosion. Thousands of gallons of CSO spilled into the canal in Chicago near the Cicero Avenue bridge, and the accident temporarily closed and impeded the canal. The Government alleges that Oliva improperly used a propane rosebud torch to thaw a broken pump on the EMC-423. The use of this torch, along with an allegedly improperly opened ball valve on barge's standpipe, caused vapors emanating from the CSO to ignite and explode. EMC denies that the use of a rosebud torch caused the explosion. Rather, it contends that the contaminated CSO Exxon loaded onto the barge caused the explosion.

The Government filed a five-count Complaint on June 2, 2008, followed by an Amended Complaint on July 24, 2008, in which it claims that EMC is the party responsible for the explosion and subsequent spill. Counts 1-3, brought under the Oil Pollution Act (the "OPA"), 33 U.S.C. § 2701, *et seq.*, seek damages of more than $1.5 million for the costs to clean up the spill, disbursements for

claims of third parties, and additional civil damages of up to $25,000 for each day of the spill cleanup. Count 4 seeks damages under the Rivers and Harbors Act, 33 U.S.C. §§ 403, 407, and Count 5 claims a violation of general maritime law.

The Government filed an indictment against EMC and the captain and pilot of the Lisa E and EMC-423, Dennis Michael Egan, in a parallel criminal prosecution on January 13, 2010. The criminal case is before Judge James B. Zagel. On September 10, 2008, EMC filed a three-count Third Party Complaint against Exxon for contribution, indemnity, and a maritime claim pursuant to Federal Rule of Civil Procedure 14(c), claiming that Exxon's negligence in loading contaminated CSO on the EMC-423 was the sole or partial cause of the explosion and spill. Upon the Government's request, the Court dismissed Count 5 of the Amended Complaint on March 30, 2009.

Now, EMC claims that the Government has deliberately violated discovery rules during this litigation in such a manner that deprives it of a fair trial, and moves to dismiss the remaining counts in the Amended Complaint pursuant to Federal Rule of Civil Procedure 37(b)(2). EMC also moves to strike three of the Government's experts because it alleges that in preparing their expert reports they improperly relied on the United States Coast

Guard's Marine Casualty Incident Report (the "MCIR") for the explosion on the EMC-423 and subsequent oil spill. In addition, Exxon moves for summary judgment on all counts of EMC's Third Party Complaint. In defending itself against Exxon's Motion, EMC moves to strike numerous paragraphs in Exxon's Rule 56.1 Statement of Material Facts. The parties have fully briefed all these motions.

## II. **ANALYSIS**

### A. **EMC's Motion to Dismiss**

EMC moves to dismiss the Amended Complaint based on the Government's alleged discovery misconduct. Among the allegations that EMC makes, it claims that the Government (1) seized documents that EMC prepared for its defense in this case when it executed a search warrant on EMC's Lemont offices, and has failed to return important documents to EMC; (2) altered key physical evidence without EMC's knowledge and failed to provide adequate custody logs for physical evidence; (3) instructed two of its witnesses not to answer numerous questions at their depositions; (4) failed to turn over newly found discovery in a timely manner; (5) failed to turn over all discoverable documents that it had in its possession, which EMC learned about at depositions; (6) failed to disclose the extent of its contacts with Exxon; and (7) failed to disclose documents it had obtained and produced in the related criminal

prosecution. EMC argues that the cumulative effect of the Government's violations warrants the extreme sanction of dismissal with prejudice of the Amended Complaint.

### 1. Legal Standard

Under Federal Rule of Civil Procedure 37(b)(2), the Court may sanction a party for failing "to obey an order to provide or permit discovery." FED. R. CIV. P. 37(b)(2)(A). While the Court possesses the inherent authority to *sua sponte* sanction a party, some form of court order — be it a written or an oral directive — is generally required for the Court to invoke Rule 37(b)(2). *See, e.g., Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994). Dismissal pursuant to Rule 37(b)(2) is harsh, and should be used on a limited basis. *See Ladien v. Astrachan*, 128 F.3d 1051, 1057 (7th Cir. 1997). Such dismissal is proper "where the offending party has displayed willfulness, bad faith, or fault, and it is a proportionate and otherwise appropriate sanction." *Shaw-Reed v. Children's Outing Ass'n*, No. 98-2202, 1999 WL 38588, at *2 (7th Cir. Jan. 27, 1999).

### 2. Merits of EMC's Motion

While EMC alleges a litany of discovery violations by the Government, not one of these allegations stem from the Government's failure to obey a court order. Fact discovery closed on

November 26, 2010.  ECF No. 138, Feb. 22, 2010.  EMC did not file this Motion to Dismiss until December 15, 2010.  It appears that EMC knew about many of the alleged discovery violations before discovery closed.  For example, the first alleged infraction occurred on April 10, 2009, when federal agents from the United States Coast Guard and the Environmental Protection Agency executed a search warrant at EMC's offices as part of the criminal proceedings.  EMC alleges that the agents seized material that related to its trial preparation in this case.  Despite having concerns about this seizure, EMC never filed a motion to compel.

Likewise, EMC cites abuses by the Government during depositions of Government witnesses.  EMC points to the depositions of Robert Reggio ("Reggio") and Eric Hann ("Hann"), which took place in September 2010, as examples of the Government's attorney improperly instructing its witnesses not to answer questions.  It appears, however, that at the Reggio and Hann depositions EMC's counsel did not object to the Government attorney's instructions to the witnesses.  Further, EMC did not file a motion to compel answers to the questions objected to during these depositions.  EMC also argues that it learned of missing documents during the depositions of Reggio, Hann, and other Government witnesses.  Again, it never filed a motion to compel production of these

documents — some of which the Government appears to have produced. Regardless, EMC does not establish the necessary bad faith or willfulness, or that it was severely prejudiced, for these alleged discovery abuses to warrant dismissal.

The Court need not address separately every discovery abuse EMC alleges. While EMC argues that the Government engaged in deliberate obstruction, its failure to raise this issue during discovery dooms its motion. EMC cannot stockpile alleged improprieties until after discovery closes and then aggregate them for a dismissal motion. Again, dismissal under Rule 37(b)(2) is a harsh sanction that the Court should use sparingly. *See Ladien*, 128 F.3d at 1057. Contrary to EMC's argument, Magistrate Judge Susan E. Cox did not rule that this is not a discovery dispute. She simply stated that this motion may be dispositive. ECF No. 205, Dec. 22, 2010. EMC's motion does, in fact, raise a discovery dispute. The Court can reopen discovery, but EMC has not moved for this. Between the timing of this Motion after the close of discovery, and the fact that the allegations do not create the requisite level of prejudice to warrant dismissal, the Court denies EMC's Motion to Dismiss.

The Court notes that EMC may address some of the concerns it has regarding the Government's evidence prior to trial through

motions in limine.  At this point, however, the Court is not prepared to rule on the admissibility of evidence, or if the Government's alleged alteration of the standpipe by cleaning it warrants sanctions at trial, without complete arguments from the parties addressing these issues.

## B.  EMC's Motion to Strike Government's Expert Witnesses

EMC moves to strike Government experts Capt. Brian Hall ("Hall"), Dr. John DeHaan ("DeHaan"), and Peter Wakefield ("Wakefield"), alleging that these witnesses improperly included information from and relied on the EMC-423 accident MCIR to prepare their expert reports.  After the accident, the Coast Guard, pursuant to 46 U.S.C. § 6301, assigned Commander Mark Hamilton to conduct an investigation into the incident. Commander Hamilton submitted the MCIR to the Coast Guard on March 24, 2008, and it became public on April 6, 2010.  The MCIR is inadmissible as evidence in this case:

> Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

46 U.S.C. § 6308(a). The broad exclusion provided by § 6308 is not at odds with Federal Rule of Evidence 703, which allows an expert to use inadmissible facts or data to form the basis of his opinion, due to the "notwithstanding any other provision of law" clause. *See Ward Hornblower Proescher, Limitation Proceedings, M/V Jack London Commodore*, 1999 AMC 1612, 1615 (N.D. Cal. 1999).

Hall, DeHaan, and Wakefield each list the MCIR as a source used to formulate their opinion, and DeHaan also considered the Hall and Wakefield reports to prepare his report. Therefore, EMC argues, each of these witnesses has been so tainted by the MCIR that the Court should strike them from the Government's expert disclosures and prohibit each from testifying. *See id.* ("The [MCIR] is inadmissible as evidence for any purpose whatsoever pursuant to 46 U.S.C. § 6308. . . . [T]he parties' expert witnesses cannot use the [MCIR] as the basis for any of their opinions."); *see also Eckstein Marine Serv., Inc. v. Crescent Marine Towing, Inc.*, No. 98-1467, 1999 U.S. Dist. LEXIS 1019, at *2 (E.D. La. Feb. 2, 1999). However, an expert report that simply cites or references an MCIR is not necessarily inadmissible, nor is the expert automatically barred from testifying. *See Baker Hughes Oilfield Operations, Inc. v. Seabulk Tankers, Inc.*, No. 03-1230, 2004 U.S. Dist. LEXIS 6900, at *4 (E.D. La. Apr. 19, 2004). A

conclusion that does not rely on and is not substantially based on the MCIR is admissible, as long as any references to the MCIR are stricken. *See id*.

### 1. *Hall's Expert Report*

Hall's report addresses the cause of the explosion on the EMC-423. He lists the MCIR as one of 28 sources he analyzed to develop his report. EMC argues that no other evidence other than the MCIR supports two presumptions in Hall's report. The first presumption is that a crew member used a propane torch on the EMC-423 to heat a cargo pump. The information about a rosebud torch connected to a propane tank being on the EMC-423 exists, however, in the deposition that Hall reviewed of Jason Hainline ("Hainline"), Process Technician at Exxon's Joliet refinery in January 2005. *See* Hainline Dep., 93:8–97:22, Oct. 20, 2010. United States Special Agent John Gamboa ("Gamboa") corroborates this testimony in his deposition. *See* Gamboa Dep., 170:24–171:20, Oct. 6, 2010.

Second, EMC argues that Hall based his opinion on the presumption in the MCIR that the EMC-423's heating system did not work. This allegedly forced Oliva to use a propane torch to heat the CSO in the barge's pump, as the CSO can solidify in cold weather. The Government has not produced any evidence that the heating system did not work in any other source that Hall analyzed.

It can be implied in Gamboa's deposition, however, when he states that using a rosebud torch on the pump "was a common occurrence . . . because it would freeze up in inclement weather." *Id*. at 171:18-20.  Presumably, if the heating system worked, using the torch would have been unnecessary.  Hall, however, states as a fact that the heating system did not work, which based on a review of the sources he reviewed exists only in the MCIR.  Hall, therefore, cannot state as a fact that the system did not work.  Therefore, the Court strikes the two references in his report that the heating system was inoperable at the time of the accident.

This presumption, however, is not material to Hall's opinion.  Whether the system worked or not, Hall can use as a foundation for his opinion that Oliva used a rosebud torch on the pump.  The inoperable heating system is only a potential reason why Oliva would use the torch.  While Hall can speculate as to why Oliva used a rosebud torch on the pump, he cannot couch this speculation as fact.  Accordingly, the rest of Hall's opinion does not rely on the MCIR, and is admissible.

### 2.  DeHaan's Expert Opinion

DeHaan works as a forensic scientist/criminalist.  His report addresses the cause of the explosion on the EMC-423.  He lists 20 resources he reviewed to prepare his report, including the MCIR and

Hall and Wakefield's reports. Again, EMC argues that DeHaan relied on the MCIR for the evidence to form his opinion. Conveniently, in the analysis section of his report, DeHaan cites the resources he used to form each section of his opinion. Only two sections of this analysis rely solely on the MCIR: the second full paragraph on page 5, and the third full paragraph on page 6, which specifically discusses Capt. Hamilton's findings in the MCIR. Pursuant to § 6308(a), the Court strikes these paragraphs. In addition, all other references to this report are stricken, including the photographs and overhead views and reconstructions from the MCIR.

Contrary to EMC's argument, however, DeHaan does not rely on evidence in the MCIR to formulate the central findings of his report. Rather, the MCIR contains evidence mostly cumulative of other documents that DeHaan uses to reconstruct the events that unfolded on the EMC-423. Further, DeHaan's opinion as it relates to the contents of the cargo on the EMC-423 does not rely on the MCIR. As such, except for the sections cited above, DeHaan's opinion is admissible. Further, all other references to the MCIR are stricken from his report.

### 3. Wakefield's Expert Opinion

Wakefield starts his report by writing, "After review of the [MCIR], [i]t is clear that Alexander Oliva (Deckhand) caused the

- 13 -

explosion and fire than resulting in the sinking of Tank Barge EMC 423. . . ." Obviously, this section, as well as any other sections of Wakefield's report that address the cause of the explosion — including that the ship's onboard heating system was inoperable — are inadmissible under § 6308(a). In addition, the Court strikes the photos in the report culled from the MCIR.

Wakefield's report, however, does not principally address the cause of the accident. Rather, it addresses the rosebud torch allegedly used by Oliva to heat the pump. It provides a general background on propane torches, addressing how they work, where they are sold, and in what circumstances people use them. Wakefield did not acquire this information from the MCIR. As such, despite its opening paragraph, Wakefield's report about the torch is admissible. However, all references in the report as to the cause of the accident, how it could have been prevented, and photos from the MCIR are stricken.

In sum, EMC's Motion to Strike the Government's Expert Witnesses is granted in part and denied in part.

### C. Exxon's Motion for Summary Judgment

EMC's Third Party Complaint raises three counts against Exxon: (1) indemnity; (2) contribution; and (3) liability under Federal Rule of Civil Procedure 14(c). Exxon has moved for summary

judgment on all counts of this Complaint.  Resolution of EMC's
Motion to Strike portions of Exxon's Rule 56.1 statement of
material facts, as well as determining what law applies to this
case, is necessary before addressing the merits of Exxon's motion.

### 1. EMC's Motion to Strike Portions of Exxon's Statement of Facts

This district requires a party that moves for summary judgment
to file a statement of material facts that it contends entitle it
to judgment as a matter of law.  N.D. Ill. R. 56.1(a)(3).  Exxon
has filed this statement, and EMC moves to strike certain facts in
it.  The Court will address each separately.

### a. Paragraphs 36, 65, and 66

EMC alleges that these paragraphs state improper legal
conclusions, which should be stricken.  *See Judson Atkinson
Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2
(7th Cir. 2008).  The Court has the discretion to require strict
compliance with Local Rule 56.1. *See id.*  EMC argues that the
statement that the CSO was "properly monitored" in Paragraphs 36
and 66 states a legal conclusion.  However, an affidavit from
Clifton Gilbert Henne ("Henne"), the Optimization Supervisor at
Exxon's Joliet refinery at the time of the accident, supports this
statement.  Henne's statement that the cargo loaded onto the EMC-

423 before the accident was properly monitored refers to Exxon's practices at the refinery. Whether Exxon's monitoring of the CSO eliminates its liability to EMC constitutes a legal conclusion. Paragraphs 36 and 66 do not make this conclusion, and thus do not violate Rule 56.1.

EMC also objects to the statement in Paragraph 65 that the CSO loaded onto the EMC-423 was "fit and appropriate for transportation." The Court agrees that this statement is a legal conclusion, despite its support from Henne's affidavit. Coast Guard regulations determine if a cargo is fit for transportation. Compliance with these regulations is a question of law. Thus, the Court strikes this part of Paragraph 65. The Court, however, considers the rest of this paragraph in ruling on summary judgment.

### b. Paragraph 68

EMC argues that this paragraph is inadmissible pursuant to 46 U.S.C. § 6308(a), as it states facts found in the MCIR. Exxon argues that this statement is culled from the depositions of Lieutenant Commander Michael Reed ("Reed") and Commander Hamilton ("Hamilton"). Hamilton, however, prepared the MCIR, and Reed worked on the investigation. Using their deposition testimony as a means to insert the findings of the MCIR as a material fact on summary judgment violates § 6308(a), as this testimony relies on

the MCIR. *See Baker Hughes*, 2004 U.S. Dist. LEXIS 6900, at *4.
Therefore, the Court strikes Paragraph 68.

    *c. Paragraphs 9–11, 38, 39, 41, 42, 44, 45, 47, 49–51*

    The next statements EMC seeks to strike addresses the testing
by independent contractor SGS ("SGS") on the CSO loaded onto the
EMC-423. SGS conducted these tests under the contract between
Exxon and Clark Oil. EMC claims that these statements are
irrelevant to Exxon's motion. *See Harney v. Speedway SuperAmerica,
LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). The testing of the CSO,
however, is relevant. EMC has tendered an expert report from
Donald Flessner ("Flessner") of Baker & O'Brien Inc., which
concludes that light hydrocarbons contaminated the CSO loaded onto
the EMC-423. SGS performed the testing set forth in these
contested paragraphs on samples of the CSO taken before Exxon
loaded it onto the barge and after the CSO was unloaded. The fact
that SGS performed the actual testing on these samples after the
explosion on the EMC-423 does not eliminate the relevancy of these
tests.

    Exxon has provided an affidavit from Stan Houser ("Houser"),
Branch Manager for SGS, which details the procedures used to test
the CSO loaded onto the barge. EMC can and does contest the
accuracy of these tests; however, the Court cannot make a factual

determination as to the accuracy of these tests.  As such, these tests are relevant, as they directly relate to the breaches of duty that EMC alleges warrants it receiving contribution and indemnity from Exxon.  Accordingly, the Court does not strike these paragraphs.

### d. Paragraphs 53-63

EMC claims that the testing that STAT Analysis Corporation ("STAT") performed after the accident on product and air samples from Storage Tanks 515 and 516 at Exxon's Joliet refinery, as well as on product and air samples from the storage tanks on the EMC-423, is irrelevant.  This testing revealed that the material in the tanks and on the barge was "essentially the same."  These facts have relevance because EMC primarily argues that Exxon loaded a contaminated cargo onto the EMC-423.  This testing relates directly to EMC's claim that Exxon negligently violated Coast Guard regulations by loading a cargo onto the EMC-423 that the barge's certification did not allow.  Further, as explained below in the analysis of Exxon's summary judgment motion, the tests by STAT are relevant to whether Exxon breached its duty to warn EMC of the nature of its cargo.  As such, the Court does not strike these paragraphs.

### e. Paragraphs 15-27

These paragraphs relate to the Material Safety Data Sheets (the "MSDS") that Exxon created for the CSO it produced at its Joliet refinery. Exxon had provided the last version of the MSDS it produced before the accident (in 1999) to EMC. EMC argues, however, that because gasoline allegedly contaminated the CSO loaded onto the EMC-423, the MSDS does not address the actual cargo on the barge. As explained in more detail below, the 1999 MSDS is material as to whether Exxon breached its duty to warn. EMC also argues that contradictory statements in the MSDS make it unreliable. The Court, however, cannot determine if seemingly contradictory statements in the MSDS make it irrelevant; this would be an improper weighing of the evidence. Therefore, the Court does not strike these paragraphs.

### f. Paragraphs 14, 35

Despite taking different positions on these paragraphs, EMC and Exxon appear to agree that the facts stated in them ultimately present irrelevant issues to the disposition of Exxon's motion. Paragraph 14 relates to whether Exxon "weathers" the CSO at its Joliet refinery, and Paragraph 35 relates to why Exxon loads from a static tank. The fact that EMC does not raise these issues in its cursory Third Party Complaint does not make them irrelevant. Exxon claims that EMC presented these issues as potential theories

of liability during discovery. While these concepts do not appear in EMC's brief or statement of facts in defending against summary judgment, the fact it raised them during discovery warrants their inclusion in Exxon's statement of facts. Nevertheless, while the Court denies EMC's motion to strike on these, the Court does not consider these facts in ruling on summary judgment.

### g. Paragraphs 69, 70

These paragraphs relate to the fact that Clark Oil accepted the salvaged CSO from the EMC-423 several months after the explosion on the ship. The Court does not agree with EMC's argument that these statements are irrelevant. Exhibit R of Exxon's Statement of Facts does not detail the specific findings of Clark Oil's tests of the CSO salvaged from the barge. A reasonable presumption, however, would be that because the CSO satisfied the sales contract between Exxon and Clark Oil, Exxon did not load a product onto the EMC-423 that was contaminated beyond the variances allowed in producing CSO. This relates to EMC's claims that Exxon violated Coast Guard regulations, the implied warranty of safe cargo, and the duty to warn. Accordingly, the Court denies EMC's motion for these paragraphs.

### h. Paragraph 67

Paragraph 67 contains a fact culled from the deposition of Irvin Holm ("Holm"), the Console Shift Supervisor at Exxon's Joliet refinery in January 2005. Through Holm's deposition, Exxon has laid a proper foundation for this statement. The Court does not strike it.

In sum, EMC's Motion to Strike is granted in part and denied in part. Paragraph 68 and part of Paragraph 65 are stricken. The rest of Exxon's Statement of Facts remains intact.

## 2. *Law Applicable to EMC's Claim*

In its Third Party Complaint, EMC states that this Court has diversity and federal question jurisdiction over this case. EMC does not directly state that this Court has maritime jurisdiction pursuant to 28 U.S.C. § 1333(1), by which the Court would apply substantive maritime law. *See East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 864 (1986). It does, however, raise a maritime claim under Rule 14(c) in Count 3 of the Third Party Complaint. While not a model in precision pleading, the Third Party Complaint sufficiently alleges maritime jurisdiction. Such jurisdiction arises when a tort occurs on the navigable waters of the United States, *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 205 (1971), and the tort bears "a significant relationship to traditional maritime activity." *Exec. Jet*

*Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 268 (1972).

Presumably because EMC did not plead that this case emerges under maritime jurisdiction, Exxon's memorandum in support of its summary judgment motion addresses federal common law, the OPA, and Illinois state law. After EMC argued that this case involves maritime law in its response brief, Exxon argued that while EMC has turned its Third Party Complaint into a "moving target," summary judgment is still warranted under maritime law. This case involves the loading of CSO onto the EMC-423 tank barge, and the subsequent destruction of the ship and the spilling of the CSO into the Chicago Sanitary Ship Canal when the cargo exploded. The Canal qualifies as part of the navigable waters of the United States. As such, the Court finds that maritime law, in addition to the OPA, applies to this case. *See Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994)("[T]he court "has an independent duty to satisfy itself that it has subject-matter jurisdiction.").

Because it based its arguments in its reply brief on the application of maritime law to this case, Exxon has sufficiently addressed the merits of EMC's maritime claims. Also, it should be noted that EMC did not address Exxon's argument that it did not violate Illinois products liability laws. "A party's failure to

address an argument in a summary judgment response is deemed a waiver." *DeLaney v. Chertoff*, No. 07-C-5785, 2008 U.S. Dist. LEXIS 88192, at *8 (N.D. Ill. Oct. 30, 2008). As such, because EMC has not developed an argument as to why Exxon is liable under Illinois products liability law, it has waived this as a basis for contribution under 33 U.S.C. § 2709.

### 3. Legal Standard for Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it could affect the outcome of the suit, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on summary judgment, the Court does not weigh the evidence or determine the truth of the matter, but determines whether a genuine issue of material fact exists that warrants trial. *See id.* at 249. In making this determination, the Court must view all the evidence and draw any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

The moving party bears the burden of establishing the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial. *See Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). To support their position that a genuine issue of material fact does or does not exist, the parties may cite to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers, or show that the materials in the record do or do not establish a genuine dispute. Fed. R. Civ. P. 56(c).

### 4. Merits of Exxon's Motion

#### a. Contribution

EMC argues that because genuine issues of material fact exist that Exxon's negligence was the sole or partial cause of the explosion on the EMC-423 that led to the oil spill, summary judgment is improper. A general right of contribution between joint tortfeasors exists under maritime law, with liability apportioned according to fault. *See Hunley v. Ace Maritime Corp.*,

927 F.2d 493, 496 (9th Cir. 1991).  Further, under the OPA, a party

"may bring a civil action for contribution against any other person

who is liable or potentially liable under this Act or another law."

33 U.S.C. § 2709.  A third party is treated as the responsible

party under the OPA if the oil spill damages were caused "solely by

an act or omission" by the third party. *Id*. at § 2702(d)(1)(A).  In

regard to the "other law" provision of the OPA, maritime law

applies to this case.  As such, EMC raises three duties that Exxon

allegedly breached which make it liable for damages accruing from

the accident:  (1) it violated Coast Guard regulations; (2) it

breached the implied warranty of safe cargo; and (3) it breached

the duty to warn.

## I.  Coast Guard Regulation Violation

The EMC-423 barge is subject to inspection by the Coast Guard

to certify that it can handle cargo of flammable or combustible

liquids classified as Grade A, B, C, D, or E. 46 C.F.R. § 31.05-1.

A flammable liquid has a flashpoint at or below 80 degrees

Fahrenheit. *Id*. at § 30.10-22.  Flammable liquids are classified as

Grade A, B, or C depending on their Reid vapor pressure. *Id*.

Grade D and E cargoes are combustible, with Grade D having a

flashpoint above 80 degrees Fahrenheit and below 150 degrees

Fahrenheit, and Grade E having a flashpoint of 150 degrees or above. *Id.* at § 30.10-15.

The EMC-423 was certified to carry Grade B cargo. EMC Statement of Additional Facts Ex. D at 2 (Temporary Certificate of Inspection). EMC argues, however, that because the EMC-423 was equipped with a thermal fluid heater, it could carry only Grade E cargo. The Coast Guard certificate of inspection does not reflect this change in certification. No evidence exists in the record that the EMC-423 could not carry Grade B, C, or D cargo as long as the heater was not in operation. *See, e.g.*, Carie Dep., 95:12-96:25, Oct. 22, 2010. Further, no evidence exists that the heater on board the barge operated when Exxon loaded CSO onto the EMC-423, or when the barge carried the CSO. In addition, no evidence exists that EMC informed Exxon that it equipped the barge with a heater that affected its ability to haul anything other than Grade E cargo. More significantly, no evidence exists that the CSO loaded onto the EMC-423 had a flashpoint below 150 degrees Fahrenheit. As such, as a matter of law Exxon loaded a Grade E cargo of CSO onto the barge prior to the accident. 46 C.F.R. § 30.10-15.

EMC's expert report by Flessner states that light hydrocarbons contaminated the CSO that Exxon loaded onto the EMC-423.

Flessner's report, however, does not indicate that the CSO had a flashpoint below 150 degrees Fahrenheit. In his deposition, Flessner stated that all of the testing done prior to and after the explosion on the EMC-423 showed that the CSO at the Joliet refinery and loaded onto the EMC-423 had a flashpoint above 150 degrees. Flessner Dep. 254:21-257:7, Apr. 28, 2011. Accordingly, no evidence exists that Exxon violated Coast Guard regulations in loading the CSO onto the EMC-423. This does not provide EMC a ground for contribution.

ii. Implied Warranty of Safe Cargo

EMC alleges that Exxon breached the implied warranty that the CSO was "fit for carriage in the ordinary way and . . . not dangerous." *Westchester Fire Ins. Co. v. Buffalo Housewrecking & Salvage Co.*, 40 F.Supp. 378, 381 (W.D.N.Y. 1941)(internal citation omitted). "This rule however, does not apply where the shipowner knows, or ought to know, the dangerous character of the goods." *Id*. at 381-82. As stated above, no evidence exists that the cargo in the EMC-423 was anything other than a Grade E combustible liquid. As a carrier of combustible petroleum products, EMC had a duty to know about the dangerous nature of its cargo. No evidence exists that the CSO had dangerous properties that would have caused EMC to treat the cargo differently than it would in its usual and

ordinary course of business.  As such, no evidence exists that Exxon breached the implied warranty of safe cargo.

### iii.  Duty to Warn

Under maritime law, "a shipper has a duty to warn the stevedore and the ship owner of the foreseeable hazards inherent in the cargo of which the stevedore and the ship's master could not reasonably have been expected to be aware." *Ente Nazionale Per L'Energia Electtrica v. Baliwag Nav., Inc.*, 774 F.2d 648, 655 (4th Cir. 1985).  Similar to the implied warranty of safe cargo, the duty to warn does not apply in a case in which the shipowner knows or should have known of the hazards associated with the cargo. *See id.*  The elements of a duty to warn cause of action are the common elements of a negligence claim:  duty, breach, causation, and damages. *See In re M/V DG Harmony*, 533 F.3d 83, 94 (2d Cir. 2008).

In this case, a genuine issue of material fact exists on the breach element.  Exxon gave EMC a Material Safety Data Sheet ("MSDS") that indicated that the CSO it provided to EMC had a flashpoint above 141 degrees Fahrenheit.  EMC argues that changes to the CSO processing at Exxon's Joliet refinery created a product that did not comply with the MSDS, which made the MSDS obsolete. The Flessner expert report supports this argument.  While Exxon disputes Flessner's findings and offers extensive evidence that the

CSO was not contaminated, the Court cannot weigh competing facts on summary judgment. *See Kodish v. Oakbrook Terrace Fire Protection Dist*., 604 F.3d 490, 505 (7th Cir. 2010). The weight of evidence that Exxon has tendered does not eliminate the issue of material fact created by Flessner's report.

EMC's duty to warn claim, however, runs into a roadblock at the causation element. In maritime law, proximate cause is "that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened." *Ente Nazionale*, 774 F.2d at 655 (internal quotation omitted). EMC must show that the allegedly contaminated CSO caused the harm, and that, if Exxon had warned it of the change in the properties of the CSO, it would have changed the conditions under which it would have carried the product. *See In re M/V DG Harmony*, 533 F.3d at 96.

EMC admits that it received the MSDS from Exxon, which warned that the CSO can create a flammable atmosphere in the storage tank headspace with a flashpoint less than that of the CSO. The MSDS also advised EMC to store the CSO in a cool area, not to place any ignition sources in the area surrounding the filling and venting operations of the barge, and to avoid sparking conditions. EMC argues that the MSDS was "generic" because it did not address the

alleged light hydrocarbon contamination. The MSDS, however, did warn EMC of the potential dangers of the product. This gave EMC sufficient warnings about the dangers of the cargo. *See, e.g., Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 464 (5th Cir. 1976) ("[I]n an action for negligent failure to warn, there is no right to recovery where the party to be warned is already aware of the danger."). Further, no evidence exists that the alleged danger presented by the contamination caused the explosion and resulting spill. *See In re M/V DG Harmony*, 533 F.3d at 96. From the facts before the Court, Exxon's failure to warn EMC about the alleged contamination was not a contributing cause of the accident. The Coast Guard certified the EMC-423 to carry a Grade B cargo. No facts in the record show that the crew of the EMC-423 would have treated the cargo loaded on it in January 2005 any differently had it known of the alleged contamination. *See Ente Nazionale*, 774 F.2d at 656–57.

To accept EMC's argument that the alleged contamination was the sole or contributing cause of the explosion and spill, the Court must speculate as to causation. Such an exercise would extend beyond drawing a reasonable inference in favor of EMC, as it would require the Court to assume facts not presently before it. As such, this speculation as to causation does not defeat Exxon's

summary judgment motion. *See Joyce v. J.C. Penney Corp., Inc*., 389 Fed.Appx. 529, 531 (7th Cir. 2010).

Further, because no evidence exists that the allegedly contaminated CSO caused the explosion and subsequent oil spill, EMC has not produced a genuine issue of material fact that Exxon solely caused the oil spill. As such, the OPA does not provide grounds for contribution. 33 U.S.C. § 2702(d)(1)(A). Therefore, the Court grants Exxon's Motion for Summary Judgment on Count 2 of EMC's Third Party Complaint.

### b. *Indemnity*

EMC also seeks indemnity from Exxon for liability it may incur to the Government. In this case, because the OPA and maritime law govern the underlying action, these laws apply to this indemnity claim. *See Cooper v. Meridian Yachts, Ltd*., 575 F.3d 1151, 1172 n.12 (11th Cir. 2009). The OPA provides that EMC is not liable for removal costs or damages if Exxon solely caused them. 33 U.S.C. § 2702(a)(1)(A). In maritime law, a split in authority exists on whether an active-passive negligence doctrine may serve as a basis for indemnity. While this circuit appears not to have addressed this issue, the Third and Fourth Circuits use this doctrine. *See SPM Corp. v. M/V Ming Moon*, 22 F.3d 523, 526 (3d Cir. 1994); *Vaughn v. Farrell Lines, Inc*., 937 F.2d 953, 957 (4th Cir. 1991)("This

active-passive theory typically arises when the indemnitee has been held absolutely liable for the wrongful act of another. . . .")). The Fifth Circuit, on the other hand, has abandoned the active-passive doctrine for admiralty negligence cases. *See Seal Offshore, Inc. v. Am. Standard, Inc*., 736 F.2d 1078, 1082 (5th Cir. 1984)(applying comparative fault); *see also Miller v. Am. President Lines, Ltd*., 989 F.2d 1450, 1459 (6th Cir. 1993)(applying comparative causation).

The Court need not determine which standard applies in this case, because under the active-passive doctrine, comparative fault, or comparative causation, no genuine issue of material fact exists that Exxon is liable for the explosion and spill.  For the reasons stated above in the contribution analysis, EMC has not presented any facts that Exxon's alleged negligence caused the accident and spill.  In each of the alleged theories of negligence that EMC raises, it either cannot establish that Exxon breached its duty to EMC (Coast Guard regulation violation and implied warranty of safe cargo) or that Exxon's breach caused the damages (duty to warn). Again, the Court cannot speculate on causation for EMC's indemnity claim.  Accordingly, the Court grants Exxon's Motion for Summary Judgment on EMC's indemnity claim in Count 1 of the Third Party Complaint.

In addition, because there are no facts before the Court that Exxon is wholly or partially liable to EMC and the United States for the damages caused by the oil spill after the EMC-423 explosion, the Court also grants Exxon summary judgment on EMC's Rule 14(c) liability claim in Count 3 of its Third Party Complaint.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

1.    EMC's Motion to Dismiss is denied;

2.    EMC's Motion to Strike the Government's Expert Witnesses is granted in part and denied in part;

3.    EMC's Motion to Strike Portions of Exxon's Statement of Material Facts is granted in part and denied in part; and

4.    Exxon's Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

**DATE:** 8/9/2011