**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

_____
                                              )
**UNITED STATES OF AMERICA,**                 )     **Civil Action No. 08-CV-3160**
                                              )
        **Plaintiff,**                        )     **Judge Leinenweber**
                                              )     **Magistrate Cox**
                                              )
        **v.**                                )
                                              )
**EGAN MARINE CORPORATION,** *in*             )
*personam,* **MOTOR VESSEL LISA E,** *in rem,*)
**TANK BARGE EMC-423,** *in rem,*             )
                                              )
        **Defendants.**                       )
                                              )
_____)
**EGAN MARINE CORPORATION,**                  )
                                              )
        **Defendant/**                        )
        **Third-Party Plaintiff,**            )
                                              )
        **v.**                                )
                                              )
**EXXON MOBIL CORPORATION and**               )
**EXXONMOBIL OIL CORPORATION,**               )
                                              )
                                              )
        **Third-Party Defendants.**           )
_____)

**EGAN MARINE CORPORATION'S CONSOLIDATED MOTION IN LIMINE TO
EXCLUDE CERTAIN EVIDENCE AT TRIAL**

NOW COMES Egan Marine Corporation (hereinafter, "EMC"), by and through its

undersigned counsel, and, for the reasons stated below, respectfully moves, *in limine*, for an

Order excluding from evidence at trial: (1) the "Propane Torch" identified as Plaintiff's Exhibit

3[1]; (2) the standpipe and section of heat trace line from the EMC-423, identified as Plaintiff's

_____
[1] Exhibit numbers to which reference is made in this Motion are those assigned to them by the
Government in its draft of the Final Pretrial Order for this case.

Exhibits 1 and 2, respectively; (3) any testimony based on or derived from the United States Coast Guard's Marine Casualty Incident Report including the photographs, notes, exhibits, figures, tables it contains; (4) any testimony by expert witness John DeHaan concerning opinions first disclosed in his untimely rebuttal report; (5) any references to Alex Oliva's use of a propane torch aboard the EMC-423; 6) any testimony concerning statements allegedly made by the LISA E's crewmembers the night of the explosion; and 7) any reference to civil penalties imposed on EMC for administrative infractions.

This pleading exceeds 15 pages in length, however, it consolidates several Motions in Limine and no one motion exceeds 15 pages.  Accordingly, like the United States,[2] EMC believes that this pleading's length does not exceed the page limitations set forth under Local Rule 7.1.

----

[2] Both of the United States' Motions in Limine exceeded the page limitations of Local Rule 7.1, however, the Government maintained that the rule was inapplicable to consolidated motions that replace numerous individual filings. (*See*, ECF Doc. No. 261-1 and 292-1.)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................v

I.      PHYSICAL EVIDENCE ...........................................................................1

      a.     The Propane Torch...................................................................1

             1.     The Propane Torch is Irrelevant ...................................1

             2.     Admitting the Propane Torch Would be Misleading to the Court and Unfairly Prejudicial to EMC ...................3

      b.     The Standpipe and Heat Trace Line...................................................4

             1.     The Standpipe ...................................................5

             2.     The Heat Trace Line ...................................................6

II.     TRIAL TESTIMONY ...........................................................................7

      a.     Testimony Based on or Derived From the United States Coast Guard's Marine Casualty Investigation Report ("MCIR")...................7

      b.     Opinions First Disclosed in John DeHaan's Untimely Rebuttal Report...................8

             1.     DeHaan's Report is Rebuttal, NOT Supplemental ...................10

             2.     Exclusion is "Automatic and Mandatory" ...................12

             3.     The Government's Failure to Comply with the Expert Witness Rebuttal Deadline was not "justified or harmless"...................14

      c.     Testimony Concerning Use of a Propane Torch by Alex Oliva ...................16

      d.     Testimony Concerning Statements Allegedly Made by the LISA E's Crewmembers the Night of the Explosion...................17

             1.     The LISA E's Crewmembers' Statements are not Party Admissions...................18

             2.     The LISA E's Crewmembers' Statements are Inadmissible Hearsay ...................20

             3.     Even if the LISA E Crewmembers' Statements were Party Admissions or Fell Within and Exception to the Hearsay Rule, They Still must be Excluded ...................20

e.      Reference to Civil Penalties imposed on EMC for Administrative Infractions.....22

CONCLUSION........................................................................................................................23

# TABLE OF AUTHORITIES

## Cases

Aliotta v. National Railroad Passenger Corp.,
    315 F.3d 756 (7th Cir. 2003) ............................................................................19, 21

Coles v. Perry,
    217 F.R.D. 1 (D. D.C. 2003).........................................................................................11

David v. Caterpillar, Inc.,
    324 F.3d 851 (7th Cir. 2003) ...............................................................................13, 14

Finley v. Marathon Oil Co.,
    75 F.3d 1225 (7th Cir. 1996) .....................................................................................13

Hill v. Porter Memorial Hosp.,
    90 F.3d 220 (7th Cir. 1997) .......................................................................................13

Mister v. Northeast Illinois Commuter Railroad Corp.,
    571 F.3d. 696 (7th Cir. 2009) ...........................................................................19, 21, 22

NutraSweet Co. v. X-L Engineering Co.,
    227 F.3d 776 (7th Cir. 2000) ...............................................................................13, 14

Salgado v. General Motors Corp.,
    150 F.3d 735 (7th Cir. 1998) .....................................................................................13

United States of America v. Prieto,
    549 F.3d 513 (7th Cir. 2008) .......................................................................................5

United States v. Halliburton Co.,
    272 F.R.D. 235 (D. D.C. 2011).....................................................................................11

United States v. Jackson,
    540 F.3d 578 (7th Cir. 2008) .....................................................................................20

United States v. Turner,
    591 F.3d 928 (7th Cir. 2010) .......................................................................................5

## Statutes

46 U.S.C. § 6308(a) .......................................................................................................7

## Rules

Fed. R. Civ. P. 26(a) ............................................................................9, 10, 13

Fed. R. Civ. P. 26(a)(2) ...........................................................................9, 10

Fed. R. Civ. P. 26(a)(2)(D) ................................................................10, 11, 13

Fed. R. Civ. P. 26(e) ................................................................................10, 11

Fed. R. Civ. P. 37(c) ......................................................................................13

Fed. R. Civ. P. 37(c)(1) ..............................................................................9, 13

Fed. R. Evid. 401 .............................................................................................1

Fed. R. Evid. 402 .............................................................................................1

Fed. R. Evid. 403 ...........................................................................3, 21, 22, 23

Fed. R. Evid. 602 ......................................................................................16, 21

Fed. R. Evid. 703 ...........................................................................................16

Fed. R. Evid. 801(c) ......................................................................................20

Fed. R. Evid. 801(d)(2) ........................................................................18, 19, 21

Fed. R. Evid. 802 ...........................................................................................20

## I.     PHYSICAL EVIDENCE

### a.     The Propane Torch.

The Plaintiff, the United States of America (hereinafter, the "Government") has identified as its Exhibit No. 3, a "Propane Torch."[3]  That torch did not come from the EMC-423.  Nor did it come from the LISA E.[4]  Neither is there a scintilla of evidence to suggest that it had been aboard either the EMC-423 or the LISA E at any time.  Ever.  It has absolutely no meaningful connection to the events giving rise to this suit.  Nevertheless, the Government wants to introduce it into evidence in this case.  For the reasons set forth below, it must be excluded.

### 1.     The Propane Torch is Irrelevant.

"Evidence which is not relevant is inadmissible."  Fed. R. Evid. 402.  To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  In this instance, the Propane Torch the Government intends to introduce[5] simply is not relevant.

---

[3] Although EMC is left to guess just what the Government means by this cryptic reference, it is assumed that in using the term "propane torch", the Government is referring, collectively, to a twenty-pound propane cylinder (the "tank"), a rubber hose used to connect the cylinder to a wand, and a long metal flame-producing wand colloquially called a "weed-burner" attached to the hose.  Throughout this case, the wand has erroneously and repeatedly been labeled a "rosebud."  It is not.  A "rosebud" is used in connection with an acetylene welding kit.  A weed-burner, on the other hand, is not used for welding and is fueled by use of a propane tank.  Given the ubiquity of the "rosebud" misnomer by the parties, witnesses, and counsel in this case, for simplicity's sake the weed-burner wand will be called a rosebud in this brief.

[4] The LISA E was the tugboat pushing the EMC-423 tank barge at the time of the explosion.  Alex Oliva had been a crewmember serving aboard the LISA E.

[5] The Government never produced nor even identified the Propane Torch during the fact discovery phase of this case.  The first hint that EMC had that the Government might intend to introduce such an exhibit at trial came in January of this year (more than two and a half years into this litigation and almost two months after the close of fact discovery in this case), when it provided EMC's counsel with photographs (taken on January 20, 2011) of what it called a "rosebud" wand in the Government's custody.  Nothing more was said about that rosebud or the Propane Torch that the Government possessed until July of 2011,

Make no mistake: the Government desperately wants to be able to introduce into evidence something—*anything*—to which it can point as physical evidence to support its central thesis that EMC's employee, Alex Oliva, was using a propane torch aboard the EMC-423 immediately prior to the explosion giving rise to this case. (*See*, *e.g.,* Verified Complaint and Amended Verified Complaint, ECF Doc. Nos. 1 & 14, respectively.) Yet, to date, the Government has been unable to find such evidence. Indeed, despite literally years of diligent searching and much highly sophisticated investigative effort, the Government has failed to identify *any* direct evidence that a propane torch was used aboard the EMC-423 on the day of the explosion. (*See, e.g*., Deposition of Robert Reggio, excerpts attached here to as Exhibit B, hereinafter "Reggio Dep.," 142:11-146:22; 87:14-89:11.) This is a particular problem for the Government, because all of its case depends on its proving Alex Oliva's use of a propane torch aboard the barge.

Frustrated that it was unable to find any sign of the phantom propane torch it contends was used to set off the explosion aboard the EMC-423, the Government eventually settled for the next best thing: it compelled EMC to produce a substitute. Thus, some years ago (well before this suit was filed), the Government subpoenaed from EMC a 20-pound propane cylinder and a rosebud. To be clear, EMC was not asked to produce *the* cylinder and rosebud allegedly used by Alex Oliva in January of 2005 (something it could not do, as there was no such thing). Instead, EMC was directed to provide the Government *a* 20-pound cylinder and rosebud—any one—that EMC might have in its possession at the time. (See, Deposition of Mark Hamilton, excerpts attached hereto as Exhibit C, hereinafter "Hamilton Dep.," 92:6-12, 122:24-124:21; see also, Deposition of Michael Reed, excerpts attached hereto as Exhibit D, hereinafter "Reed Dep.,"

---

when a Government witness (Peter Wakefield) allowed as to how Government counsel had shown him the rosebud component of a propane torch the day before his deposition. (Deposition of Peter J. Wakefield, excerpts attached hereto as Exhibit A, 21:24-22:12.)

111:13-113:2.)  Because EMC and the affiliated shipyard with which it is co-located routinely have several of each on hand, EMC was able to comply with the Government's subpoena by producing both a cylinder and a rosebud from its regular stock ashore.   (Reed Dep., 112:15-113:2; Hamilton Dep., 122:24-124:21.)   Although the Government ultimately returned EMC's cylinder, it decided to keep the rosebud.  (Hamilton Dep., 122:24-124:21.)  Plainly it is that rosebud (having nothing to do with the EMC-423), undoubtedly married up with a new propane cylinder and hose (having even less to do with the facts of this case), that the Government intends to offer into evidence as Plaintiff's Exhibit 3.

Nothing about the Propane Torch is either relevant or admissible at trial.  It manifestly is *not* some relic from the explosion, nor something that has ever even been aboard the EMC-423.[6] No one ever has seen it used by Alex Oliva.  It truly is a stranger to this case.

The Propane Torch is nothing more than a stand-in for missing evidence the Government cannot otherwise produce, find, or even identify.  It is a sham exhibit, hoping to masquerade as competent evidence.  Because the Propane Torch's introduction cannot conceivably make any fact of consequence in this case either more or less probable, it simply is not relevant.  And, because it is not relevant, it cannot be admitted into evidence.

2.      *Admitting the Propane Torch Would Be Misleading to the Court and Unfairly Prejudicial to EMC.*

Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, [or] confusion of the issues . . . ."  Fed. R. Evid. 403.  The problem the Government faces is that the Propane Torch has absolutely *no* probative

---

[6] Tellingly, despite this litigation dragging on for well over three years, at no time was the Propane Torch ever included in any of the in-person views of potential evidence from the EMC-423 that the Government has within its custody and to which EMC's experts, counsel, or representatives were invited to attend.

value.   It is not in any way linked to the EMC-423, the explosion of its cargo, nor any other fact associated with this case.   It is something that was just taken off the shelf at EMC.   It was not used by Alex Oliva nor by anyone else aboard the EMC-423.   Neither can anyone say that it even *looks* like what Alex Oliva was using that day because no one ever saw Alex Oliva using a propane torch *of any type* aboard that barge.

The foregoing notwithstanding, the Government is determined to place an evidence sticker on the Propane Torch and to submit it to the Court.   One can only assume that its purpose in doing so is impermissibly to suggest that such a torch was actually in use aboard the EMC-423 at the time of the explosion—and that it was Alex Oliva using it.   Not only would such an inference be grossly misleading (given the Government's lack of *any* direct evidence that such a torch had been used by *anyone* aboard the barge that day), but one could hardly imagine something more prejudicial to EMC.

Because any probative value the Propane Torch might have is so heavily outweighed by its propensity to mislead this Court and unfairly to prejudice EMC, the Government's Exhibit 3 must be excluded from the evidence in this case.


**b.      The Standpipe and Heat Trace Line.**

Unlike the Propane Torch, the two items the Government seeks to introduce as its Exhibits 1 and 2 actually came from the EMC-423.   Exhibit 1 is a pipe (the "Standpipe") salvaged from the barge's wreckage.   Exhibit 2 is a section of the EMC-423's heat trace system (the "Heat Trace Line") that at one time had been connected to the barge's cargo pump.   The Government is unable adequately to establish the chain of custody for each.   Worse, the

4

Government admits that it has fundamentally altered both. Thus, neither the Standpipe nor the section of Heat Trace Line can be admitted into evidence at trial.

In order to admit physical evidence at trial, its proponent must show that it is in "substantially the same condition" as it was at the time of the incident giving rise to the litigation. *United States v. Turner*, 591 F.3d 928, 935 (7th Cir. 2010) (citing *United States of America v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008)). Although the chain of custody need not be perfect, the Government nevertheless must "show that it took reasonable precautions to *preserve the original condition of the evidence*." *Id*. (Emphasis added.) Neither is true in this case.

      *1.     The Standpipe.*

The cargo aboard the EMC-423 exploded in January of 2005. The barge and its associated equipment were salvaged by April of that year. Yet the chain of custody logs for the Standpipe reflect its first being taken into Government custody fully two and a half years later. As it is, the Government is not altogether sure just where the Standpipe was or what may have happened to it during between early 2005 and November of 2007. Even more troubling is that, once the Government took the Standpipe into custody, its agents then intentionally and permanently altered it on several occasions.

First the Government's lead investigator forcefully broke the Standpipe from the "sled" to which it had been attached at the time of the explosion. (Reed Dep., 132:2-133:7.) Then, other Government agents admit to vigorously scrubbing the Standpipe with gasoline and brushes for *hours*, in an effort to remove material that was found on the Standpipe's internal ball valve and threads. (See, Deposition of Eric Hann, excerpts attached hereto as Exhibit E, hereinafter

"Hann Dep.," 139:5-20.) This matters. The Standpipe's condition (and, in particular, the condition of its ball valve and the threads at its top end) at the time of the explosion is a key component of the Government's case.

The Government's theory of how the explosion was ignited requires it to prove that the Standpipe allowed flammable vapors to escape, unimpeded, from the EMC-423's cargo tank No. 4. If the standpipe had a cap screwed into the threads at its top, or if the ball valve it contains was in the closed position at the time of the explosion, then the explosion aboard the EMC-423 simply could not have occurred in the manner the Government contends it did. Thus, by breaking the standpipe from its mounting on the sled, by failing to account for its whereabouts and treatment for over two years, and then by deliberately bathing it in gasoline and scrubbing it for hours, the Government has seriously and unilaterally compromised both the reliability and the evidentiary utility of this critical piece of evidence. There can be no doubt that the Standpipe is not at all in the same condition as it was at the time of the explosion. As a result, it must not be permitted to be introduced into evidence at trial.

2.    *The Heat Trace Line.*

For its part, the Heat Trace Line also was unaccounted for almost four years. After being salvaged in early 2005, the Heat Trace Line sat outdoors and effectively unguarded in a debris field on Citgo property until the Government decided to take it into custody in December of 2008. It was then that the Government's investigators unilaterally decided to detach the Heat Trace Line from the cargo pump to which it had been attached at the time of the explosion to facilitate its examination by the Government's own experts. (Reggio Dep., 106:9-107:1.) Once again, the Government undertook this alteration of key evidence without bothering to notify

EMC that it was going to do so. Hence, no one other than the Government was able to observe this evidence prior to its being removed from the pump, nor to observe the manner in which it was removed. This is important because it is the Government's contention that the heat trace system on the EMC-423 had been disconnected from the barge's cargo pump *before* the explosion occurred. Thus, the Heat Trace Line's condition (and, in particular, the condition of its connection fittings at either end of that line) is critical. By covertly disconnecting the Heat Trace Line from the pump during the pendency of this litigation, the Government has irreparably altered this evidence. It manifestly is not in the same condition it was in at the time of the explosion. As a consequence, it cannot be admitted into evidence in this case.

## II.     TRIAL TESTIMONY

### a.     Testimony Based on or Derived From the United States Coast Guard's Marine Casualty Investigation Report ("MCIR").

As this Court has already ruled, "[the] MCIR is inadmissible as evidence in this case."

(ECF Doc. No. 290, p. 9.)   That is so because:

> Notwithstanding any other provision of law, no part of a report of a maritime casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

46 U.S.C. § 6308(a).   Despite the unambiguous nature of the foregoing prohibition, the Government has consistently disregarded it and demonstrated a remarkable misapprehension of what the law has to say concerning use of the MCIR in this litigation. For example, aside from its providing the MCIR to each of its own experts, the Government routinely made reference to the MCIR and its contents in fact discovery, to include its deposition questioning of lay

witnesses.[7]   When counsel for EMC objected to such misuse of the MCIR, the Government indicated that it had a very different understanding of the law applicable to it.[8]

Given the foregoing and to clear up any confusion on this point, EMC respectfully requests that this Court exclude from evidence at trial any and all testimony based on or derived from the MCIR, to include its photographs, notes, exhibits, figures, and tables.   Such a prohibition necessarily must extend to the use of any deposition testimony wherein witnesses either read, addressed, or were asked to comment on the contents of the MCIR.

### b.      Opinions First Disclosed in John DeHann's Untimely Rebuttal Report.

The Government elected to submit a Supplemental Expert Report of John D. DeHaan (hereinafter, the "Rebuttal Report") well after the deadline for expert rebuttal, in clear violation of this Court's scheduling order and in plain disregard of the Federal Rules of Civil Procedure.

---

[7] *See e.g.*, Deposition of Joseph Oliva, excerpts attached hereto as Exhibit F,  237:6-239:20 (reciting the findings of the Coast Guard MCIR).

[8] Deposition of William Arrington, excerpts attached hereto as Exhibit G, 34:5-63:19.

(**Mr. Sump**: I'm going to place an objection on the record to these documents because they come from a report that is not disclosable in this case, and this comes from the Coast Guard report which is not discoverable nor admissible in this case.  Is that right, Mr. Kelly?  **Mr. Kelly**: The report is not discoverable, that is correct.  **Mr. Sump**: Okay. So these documents come from that report, right, Mr. Kelly?  **Mr. Kelly**: I believe that these are figures taken from that report, yes.  **Mr. Sump**: Okay. So I'm going to ask that all discussion about these documents be struck because of that requirement.  **Mr. Ruff**: Right. Well—  **Mr. Kelly**: My understanding is that the figures themselves are not the words—  **Mr. Sump**:  The tag lines would be inadmissible. I mean, if you had just the pictures, Mr. Ruff, I wouldn't care.  But when you have the tag lines on here, then that becomes part of the report, part of the conclusions of the report, and that would be improper for the witness to be answering questions about this.  **Mr. Ruff**: When you guys are done, I'll finish.  So, are you guys done?  *I don't agree with you— either of your assessments that the report is inadmissible.*  And under Federal Rule 703, 704, certainly any expert can take into account this report even if it were deemed to be inadmissible.  And all I'm using these for today is for the photos.  *So, as far as I'm concerned, I disagree with both of you as to whether or not this comes in, especially through expert testimony.*  And I further disagree with your representation that I cannot use the photographs.  And that's all I'm really using these for.  So I will continue.  **Mr. Kelly**: And I agree with Mr. Ruff with regard to the photographs, that the photographs are fine.  **Mr. Ruff**: And I fully think that everyone of our experts can look at these and take them into account because this is normally the type of information that an expert can or might take into account.  So, therefore, your indications that this cannot be used by the experts I disagree with.  **Mr. Sump**: So we don't have an expert here today, so we can argue that later.  But if you just have the photographs, Mr. Ruff, I wouldn't have a problem with this, but that's not what you have.  **Mr. Ruff**: Fine.  All right.  Let's go.)

(*See*, Supplemental Expert Report of John D. DeHaan, attached hereto as Exhibit H.) This Rebuttal Report was submitted just *three days* before DeHaan's expert deposition, the night before EMC was to begin deposing yet another Government expert. Because EMC was substantially prejudiced by the Government's inexcusably late submission, DeHaan's Rebuttal Report, including any new opinions contained therein and any deposition testimony based thereon, must be excluded from use at trial pursuant to Fed. R. Civ. P. 37(c)(1).

Counsel for, *inter alia*, the Government and EMC conferred and submitted a Proposed Scheduling Order to the Court on February 17, 2010. (ECF Doc. No. 137.) In this proposed order, the expert discovery deadlines were set forth as follows:

- January 26, 2011 – Government's Rule 26(a)(2) expert disclosures due;

- March 25, 2011 – EMC's Rule 26(a)(2) expert disclosures and rebuttal to the Government's disclosures due;

On February 22, 2010, the Court entered an order adopting the deadlines of the Proposed Scheduling Order.[9] (ECF Doc. No. 138.) With the exception of DeHaan's initial expert report, the Government timely submitted its Rule 26(a) disclosures on January 26, 2011. Pursuant to an unopposed motion for a fourteen-day extension of time, the Government subsequently submitted DeHaan's expert report on February 9, 2011.[10] On March 25, 2011, EMC timely submitted its

---

[9] On March 3, 2011, this Court subsequently entered a minute entry changing the deadline for filing the final pretrial order. The Court clearly stated, however, "all other deadlines to stand." (ECF Doc. No. 230.)

[10] On January 24, 2011, just before its expert disclosure deadline, the Government filed an unopposed motion for a fourteen-day extension of time to tender the report of one of its experts, DeHaan. (ECF Doc. No. 220.) The Government's motion sought to extend the deadline for its tender of DeHaan's expert report and the deadline for EMC to provide the reports of experts who would testify regarding similar subject matter. (*Id.* at ¶ 7.) The Government's motion made no request to change the remainder of the scheduling order's expert discovery deadlines. The Government noticed its motion for extension of time before Judge Chang, who was assigned to preside over this case following Judge Coar's retirement. The Government noticed its motion for February 8, 2011. (ECF Doc. No. 221.) On February 7, however, Judge Chang recused himself from this case (ECF Doc. No. 224), and the February 8, 2011 hearing never took place. Despite the lack of a ruling on its motion for an extension of time, the Government acted as if its motion had been granted and submitted DeHaan's report on February 9, 2011. Subsequently, EMC

Rule 26(a) expert witness disclosures.[11]  Similarly, Exxon timely tendered its expert disclosures on May 25, 2011.  The Government failed to produce any rebuttal expert reports at that time.

On June 2, 2011 after negotiation with Government counsel, EMC noticed the expert deposition of John DeHaan for 9:00 AM on June 9, 2011.  On the evening of June 6, 2011, less than three days prior to DeHaan's deposition and on the eve of EMC's deposition of yet another Government expert (and well after its May 25th rebuttal report deadline), the United States submitted DeHaan's Rebuttal Report.

### 1.    DeHaan's Report is Rebuttal, NOT Supplemental.

Despite its caption, what the Government is labeling the "supplemental" report of John DeHaan does not *supplement* anything at all.  Instead, DeHaan's Rebuttal Report plainly constitutes a dilatory rebuttal to EMC's own expert witness reports.  Because the Government filed the Rebuttal Report after the deadlines imposed both by the Federal Rules and by this Court's scheduling order, it must be struck and any opinions contained therein must be excluded from the testimony to be offered at trial.

The Federal Rules of Civil Procedure require parties to file the reports of expert witnesses they intend to use at trial.  *See*, Fed. R. Civ. P. 26(a)(2).  The Rules also contain specific provisions that relate to the filing of *supplemental* expert reports and other provisions pertaining to *rebuttal* reports.  *See*, Fed. R. Civ. P. 26(e) and Fed. R. Civ. P. 26(a)(2)(D), respectively.  Rule 26(e) requires an expert witness to file a *supplemental* expert report any time a party learns that his report is "incomplete or incorrect" up until the due date of the party's pretrial disclosures.  By

---

moved for a corresponding 14-day extension to tender the report of one of its experts, Dr. Donald J. Hoffmann, who was testifying on a subject similar to DeHaan.  (ECF Doc. No. 231.)  This Honorable Court granted EMC's motion on March 28, 2011. (ECF Doc. No. 234.)

[11] EMC submitted the expert disclosures of Donald J. Hoffmann on April 8, 2011 pursuant to the fourteen-day extension granted by this Court as discussed, *supra,* note 10.  (ECF Doc. No. 234.)

contrast, Rule 26(a)(2)(D) only allows an expert to submit a *rebuttal* report (that is, testimony intended for use as rebuttal evidence) *within thirty (30) days of the opponent's disclosure* of his expert testimony unless the district court otherwise directs or the parties otherwise stipulate.

Federal courts have made it clear that Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is *incomplete or incorrect*." *Coles v. Perry*, 217 F.R.D. 1, 3 (D. D.C. 2003) (emphasis added); *See also*, *United States v. Halliburton Co.*, 272 F.R.D. 235 (D. D.C. 2011). Based on this reasoning, federal courts have stricken "supplemental" reports that do not correct a mistake or an incomplete statement from the original report when they are filed after the court's rebuttal report deadline. *See e.g.*, *Halliburton*, 272 F.R.D. 235 (finding that Plaintiff had "no right to file a supplemental expert report" noting that "no one is pretending that the supplemental report corrected a mistake or an incomplete statement from the first report…therefore, the motion to strike the supplemental report must be granted.").

DeHaan's Rebuttal Report, which the Government submitted after the rebuttal report deadline, clearly is a rebuttal report, despite the Government's disingenuously captioning it "supplemental." In fact, Government counsel admitted as much in the email sent to all counsel of record just before tendering the new report. (June 6, 2011 Email from Rob Kelly, attached hereto as Exhibit I, "Counsel, Please be advised that Dr. DeHaan will issue a supplemental report. His supplement will, to a large part, be based on newly acquired evidence presented by Dr. Hoffman [sic] and Dr. Pless in both their files and in testimony during their depositions….") Moreover, DeHaan's use of specific reference citations to the opinions of EMC's experts in his rebuttal commentary further demonstrate that the "supplemental" report is, in fact, nothing more

11

than rebuttal.  (*See*, DeHaan's Second Report, p. 6, "It has been suggested (Item 18) [the Report of EMC's Expert, Donald Hoffmann] that the ignition was caused by self-heating of iron sulfides of pyrites that had formed within the tanks of EMC 423.")  Finally, DeHaan candidly admitted[12] in his deposition that his "supplemental" report was "primarily" aimed at "rebutting" the "hypotheses about ignition and propagation of the explosion or deflagration that had been suggested by other experts."  (*See*, Excerpts of the Deposition of John D. DeHaan, 284:16-285:21, hereinafter, "DeHaan Dep.," attached hereto as Exhibit J).  Tellingly, what *is* missing from DeHaan's Rebuttal Report are any corrections to mistakes or incomplete statements in his first report.  Instead, the Rebuttal Report only contains DeHaan's serial rebuttals to the several opinions of EMC's own experts.

Despite its exercise in creative captioning, the United States cannot circumvent this Court's scheduling order and the Federal Rules of Civil Procedure merely by naming or calling a rebuttal report "supplemental." As will be argued more fully below, because the United States filed DeHaan's rebuttal after the applicable deadline, the Rebuttal Report and any opinions contained therein must be excluded from use at trial.

2.      *Exclusion is "Automatic and Mandatory."*

The Federal Rules of Civil Procedure require disclosure to one's opponent of expert testimony intended for use as rebuttal evidence within thirty (30) days of the opponent's disclosure of his expert testimony unless the district court otherwise directs or the parties

---

[12] "Mr. Ruff: And basically what would you say the substance or nature of the purpose of the supplemental report was, sir?
Dr. DeHaan:  Well, to address other hypotheses about ignition and propagation of the explosion or deflagration that had been suggested by other experts.
Mr. Ruff:  And the other experts being other experts for Egan Marine, is that fair, sir?
Dr. DeHaan:  That's correct…"

otherwise stipulate. *See*, Fed. R. Civ. P. 26 (a)(2)(D); *Finley v. Marathon Oil Co*., 75 F.3d 1225 (7th Cir. 1996). In affirming a trial court's exclusion of expert witness testimony, the Seventh Circuit made clear that "adherence to established deadlines is essential if all parties are to have a fair opportunity to present their positions." *Hill v. Porter Memorial Hosp.*, 90 F.3d 220, 224 (7th Cir. 1997). Accordingly, if a party does not timely file his reports, the district court may exclude the party's expert from testifying at trial on the matters the party was required to disclose. *See*, Fed. R. Civ. P. 37(c)(1). The sanction of exclusion is "automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless." *NutraSweet Co. v. X-L Engineering Co*., 227 F.3d 776, 785-86 (7th Cir. 2000).

The burden to show that a late disclosure is substantially justified or is harmless rests on the party who missed the deadline. *Finley*, 75 F.3d at 1230. Indeed, Rule 37(c) presumes that exclusion of late expert disclosures "is the appropriate remedy, unless the proponent can show that the failure was either justified or harmless." *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). When assessing whether the party who missed the deadline has carried its burden, the Seventh Circuit instructs that the trial court is to be guided by the following factors: (1) prejudice or surprise to the opposing party; (2) ability to cure the prejudice; (3) likelihood of disruption of the trial; and (4) bad faith or willfulness involved in the party's failure timely to disclose his evidence. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

In this case, the Government clearly failed to comply with its expert discovery obligations under Fed. R. Civ. P. 26(a)(2)(D) and the Court's scheduling order. Under the Court's order, any supplemental or rebuttal expert reports the Government intended to file were due by May 25, 2011. In disregard of this Order (and of the Federal Rules), the Government submitted the Rebuttal Report on June 6, 2011. Accordingly, this Court must now exclude any

13

testimony premised on the opinions first disclosed therein unless the Government can show that its behavior was "justified or harmless." *NutraSweet*, 227 F.3d at 786. Plainly, this is a burden the Government cannot meet.

3. *The Government's Failure to Comply with the Expert Witness Rebuttal Deadline was not "Justified or Harmless."*

The first of the factors this Court must consider when determining whether the Government has met its burden of proving its late expert disclosure was justified or harmless is whether that late submission caused prejudice or surprise to EMC. *David*, 324 F.3d at 857. Quite plainly, it did. At the time of EMC's receipt of the late disclosure, counsel for EMC was on the road, traveling to Washington, D.C. to begin a series of depositions of the Government's expert witnesses. EMC was provided with DeHaan's Rebuttal Report just two and a half days before his scheduled deposition. This late disclosure deprived EMC of any opportunity to analyze the report, have it reviewed by EMC's experts, and prepare to depose DeHaan adequately on his rebuttal opinions. Further, at no point prior to its tardy submission on June 6th did the United States notify EMC that it intended to submit any rebuttal report by DeHaan. The Government certainly did not warn EMC that it intended to file a *late* rebuttal report so that deposition schedules could be adjusted accordingly.

The second and third factors this Court must consider are the ability to cure the Government's failure to comply with the expert disclosure deadline and the likelihood of disruption of the trial. Here, the only way to cure the Government's late disclosure would have been to allow EMC ample time to analyze DeHaan's Rebuttal Report and then to afford EMC an opportunity to re-depose DeHaan on his rebuttal opinions (at the Government's expense, of course). Government counsel, however, made it clear that they would not produce DeHaan for a

14

second deposition[13] (thereby confirming the late disclosure was a tactic of Government counsel and not a true desire to correct an incomplete record).  (DeHaan Dep., 9:14-20.)  Regardless, there simply was no time in the tight schedule between the late disclosure and the trial of this case for supplemental or repeat depositions.  When the Government made its late submission of DeHaan's Rebuttal Report, the Final Pretrial Order was due in just over two months.  Before that time, EMC had to conduct a total of *eight* more expert depositions (four more of the Government's experts and an additional four of Exxon's).  Simply put, there was no time to go back and re-depose Government experts because of the Government's failure to meet long-established deadlines.  Any deviation from the schedule would most certainly have disrupted the long-awaited trial of this case—a case that has been pending for more than three years, and which is premised on a tragic explosion that occurred well over six and a half years ago.

The last factor this Court must consider is the bad faith or willfulness involved in the Government's failure timely to disclose DeHaan's Rebuttal Report.  The Government has provided no explanation for its late disclosure.  At no time did the Government seek an extension of time to file rebuttal reports, either from this Court or from EMC, despite it having to know that DeHaan was working on one.  Instead, the Government waited until counsel for EMC were traveling to begin the deposition of DeHaan and two other Government experts before revealing DeHaan's Rebuttal Report less than three days before his deposition.

---

[13] "Mr. Abel:  …just as a heads up, we will not be addressing the supplemental report that we received late Monday, that, as I understand at least, has been filed without leave of court and not in accordance with the scheduling order.  So, if at some point, it's properly filed and before the court and part of the record of this case, we will reserve the right to come back and address whatever is in the supplemental report.

Mr. Kelly: We contend that it is properly before the parties in this case.  You've had the time to look at it and review it.  *We will produce Dr. DeHaan once for seven hours*, pursuant to the rules of procedure, so if you want to take that up at a later point in time, that's fine with us."

Because the Government failed to comply with the Federal Rules and with this Court's scheduling order, and because that failure redounds to the clear prejudice of EMC, any testimony about opinions first disclosed in the untimely Rebuttal Report of John DeHaan must be excluded from trial.

### c.    Testimony Concerning Use of a Propane Torch by Alex Oliva.

Throughout this litigation, the Government's expert and lay witnesses alike plainly have operated under the assumption that Alex Oliva, who was killed in the explosion, was using a propane torch at the time of the explosion. Indeed, several Government expert witnesses expressly state this as a *fact* in their reports. Yet the real fact of the matter is that *no one ever saw Alex Oliva using a propane torch*. Not on the day of the explosion. Not at any other time. Ever. Accordingly, absolutely no one has a credible foundation on which to testify that Alex Oliva was using such a torch at the time of the explosion.

Federal Rule of Evidence 602 expressly provides that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. While Rule 602 creates a carve-out for expert *opinions*, it does not give experts license to invent *facts* unsupported by competent evidence. Likewise, although an expert may base his opinion on inadmissible evidence, he is not free to testify about absent facts as if they were true. Fed. R. Evid. 703.

Because no one has a proper foundation to support any testimony that Alex Oliva was using a propane-powered rosebud torch at the time of the explosion, any such testimony must be excluded from the trial of this case.

16

**d.** **Testimony Concerning Statements Allegedly Made by the LISA E's Crewmembers the Night of the Explosion.**

Immediately after the explosion, government investigators forced the LISA E to the canal bank, ordered her crewmen to suspend their search for their missing shipmate, Alex Oliva, and subjected them to serial interrogations. These interrogations were conducted, while the wreck of the EMC-423 smoldered alongside them, by law enforcement officers from the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter, the "ATF"), the Chicago Police Department, the Chicago Fire Department (hereinafter, the "CFD"), and the United States Coast Guard. (See, Coast Guard Hearing Testimony of Captain Dennis M. Egan, excerpts attached hereto as Exhibit K, pp. 762:14-764:6.) They began when the LISA E's master, Dennis Michael Egan (hereinafter, "Captain Egan"), was led into the Police Department's Mobile Command Center, where CFD Fire Marshal Peter Lamanna took charge of the questioning. (*Id.*) Then, Captain Egan and another LISA E crewmember, Bill Rodgers (hereinafter, "Rodgers"), were ordered (separately) into a small pump shed located on the canal bank, where the interrogations continued. (See, Deposition of Peter Lamanna, excerpts attached hereto as Exhibit L, hereinafter "Lamanna Dep.," 25:11-29:18.) In the shed, the isolated, dazed, and outnumbered crewmembers were bombarded with a series of investigative questions from a variety of officials from numerous law enforcement agencies.

Despite the foregoing sessions satisfying even the most restrictive definition of custodial interrogation, neither Captain Egan nor Rodgers ever were given a *Miranda* warning. (Lamanna Dep., 38:5-17.) Both men were exhausted and each was observed to be visibly overwhelmed by shock and despair following the traumatic event each had just experienced and the realization that their fellow crewmember, Alex Oliva, was still unlocated and probably dead. (Lamanna Dep., 43:3-9.) Equally important, these interrogations were not recorded. Nor were either the

17

questions posed to Captain Egan and Rodgers or their answers memorialized in a reliable way. Neither man was asked to write out his own recollection of the events they had just witnessed, nor was a summary of the information they provided prepared and submitted to them for their review and authentication. Instead, some (but not all) of their government interlocutors made rough field notes about what Captain Egan and Rodgers had to say that evening. None of those notes survived.[14] What remains is nothing more than the relevant agents' badly faded memory of these sessions conducted more than six and a half years ago.

As it is, any statements made to investigators by Captain Egan, Rodgers, or their fellow crewmember, Joe Oliva (Alex's brother), the night of the explosion plainly constitute inadmissible hearsay. For that reason, EMC requests that any testimony concerning what they are remembered to have said that evening be excluded from evidence at trial.

1.      *The LISA E Crewmembers' Statements Are not Party Admissions.*

In the Government's Memorandum of Law in Support of its Second Motion in Limine, it repeatedly refers to statements Captain Egan and Rodgers made to investigators immediately after the explosion as being "admissions." (ECF Doc. No. 292-1.) It thus seems more than a little likely that the Government intends to get around the otherwise insurmountable hurdle presented by the Hearsay Rule by contending that what Captain Egan and Rodgers had to say were actually party "admissions" by EMC within the ambit of Federal Rule of Evidence 801(d)(2). Yet neither Captain Egan nor Rodgers (nor, for that matter, Joe Oliva) were

---

[14]ATF Agent John Gamboa discarded his notes, can't recall exactly what he heard, and admits that his subsequent report reflects his "paraphrasing" of what these two witnesses actually said. (See, Deposition of John Gamboa, excerpts attached hereto as Exhibit M, pp. 84:2-85:7; 159:8-17; 166:21-167:6.) For his part, Peter Lamanna says he took notes (which he may not have retained), but that they did not include any actual questions posed to or answers given by Captain Egan or Rodgers. (Lamanna Dep. 47:18-48:12).

authorized to speak on behalf of EMC in regard to what Alex Oliva *might* have been doing at the time of the explosion.[15]  Such rank speculation necessarily falls well outside the scope of either man's employment with EMC.  Thus, it cannot constitute an admission on the part of the company.

Rule 801(d)(2) provides in relevant part that "[a] statement is not hearsay if…the statement is offered against a party and is…a statement by the party's agent or servant *concerning a matter within the scope of the agency or employment*, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2); *Mister v. Northeast Illinois Commuter Railroad Corp.*, 571 F.3d 696, 698 (7th Cir. 2009) (emphasis added).  In order for an employee to be within the scope of his employment for the purposes of making a party admission on behalf of his employer, "the subject matter of the admission [must] match the subject matter of the employee's job description." *Aliotta v. National Railroad Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003).  In this case, statements Captain Egan and Rodgers made to investigators immediately after the explosion concerning what they thought *might* have or *could* have happened or what they believed Alex Oliva *could* have been doing when out of their sight quite plainly are outside the scope of their employment as EMC tug crewmen.  Such wild speculation about what an unseen fellow crewman's activities were could not possibly be the product of anything either Captain Egan or Rodgers was hired by EMC to do, what they were trained by EMC to do, nor what they would be expected by EMC to determine in the immediate wake of this catastrophe.  It is one thing to inquire about what an employee saw, or did, or knows about his job.  It is quite another to ask a professional mariner to enter the realm of conjecture concerning the cause or origin of a mysterious and unexpected explosion or the role that

---

[15] As distinct from what they were doing and what they observed, to include what they observed Alex Oliva doing at or near the time of the explosion.

someone else might have played in that disaster.  Because of that, any LISA E crewmember's statement about what Alex Oliva might have been doing at the time of the explosion cannot constitute a party admission by EMC.

### 2.    *The LISA E's Crewmembers' Statements are Inadmissible Hearsay.*

It is beyond dispute that any statement made by a witness *other* than the LISA E's crewmembers themselves about what they might have said the evening of January 19, 2005 meets the textbook definition of hearsay.  Such testimony clearly would encompass "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Of course, such hearsay is inadmissible as evidence unless each level of hearsay can fit into one of the exceptions provided in the Federal Rules of Evidence or other rules established by the Supreme Court.  Fed. R. Evid. 802 & 805.  And the burden for demonstrating the applicability of a hearsay exception (or exceptions) falls squarely on the shoulders of the proponent of the statement at issue.  *See, e.g., United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008).  To date, the Government has not attempted to offer any explanation as to why the LISA E's crewmembers' statements concerning what Alex Oliva may have been doing at the time of the explosion would fall within a recognized exception to the Hearsay Rule.  Unless and until it does (and, frankly, it is clear that it cannot), all of those statements must be excluded from evidence in this case.

### 3.    *Even if the LISA E Crewmembers' Statements Were Party Admissions or Fell within an Exception to the Hearsay Rule, They Still Must be Excluded.*

Even if this Court were to determine that the LISA E's crewmembers' statements were party admissions or that they were hearsay within an exception to the Rule, the analysis

concerning their admissibility would not end there. As the Seventh Circuit has noted, just because a statement is not hearsay "does not automatically require that [it] be admitted into evidence." *Mister*, 571 F.3d at 698. Moreover, even "[a]fter statements are classified as non-hearsay under Rule 801(d)(2)(D), the question remains whether there are other objections." *Id*. "Although there are rules that call for the generous admission of party-opponent admissions…they still don't stand for the proposition that Rule 801(d)(2) trumps *all other* Federal Rules of Evidence." *Id*.

Federal Rule of Evidence 602 presents a significant impediment to the admission of any evidence concerning what Captain Egan or Rodgers *thought* Alex Oliva *might* have been doing. That Rule prohibits a witness from testifying on a matter unless there is sufficient evidence introduced to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. Neither Captain Egan nor Rodgers could see Alex Oliva at the time of the explosion. Hence, neither had any foundation to testify as to what Alex Oliva was or could have been doing immediately before or at the time of the explosion. Even if this Court were to find their statements to be party-admissions or hearsay within an exception, they nevertheless could not be admitted into evidence precisely because they lack a proper foundation. *Id*.

Federal Rule of Evidence 403 also works to bar statements from the LISA E crewmembers allegedly made the night of the explosion. "Fed. R. Evid. 403 requires that a district court determine whether the prejudicial effect of admitting such evidence outweighs its probative value and thereby renders it inadmissible." *Mister*, 571 F.3d 698 (citing *Aliotta*, 315 F.3d at 763). In *Mister*, for instance, the Seventh Circuit found that the district court had properly refused to admit "a non-hearsay report" that was "unreliable based on the multiple

levels of hearsay in lack of precise factual statements." *Mister*, 571 F.3d 698. This is exactly the situation here.

As noted above, the statements at issue were not recorded. They were not memorialized in any meaningful way. They were not summarized and verified by either declarant. Any notes that were made at the time have long since disappeared. Instead, some six and a half years later, the government agents involved are going to be asked to dredge up the memory of what these individual witnesses might have told them in a dazed and exhausted condition. Such statements lack *any* indicia of reliability whatsoever. Thus, even if this Court were to find them admissions or hearsay within a recognized exception, they still must be excluded as they are patently unreliable and because any probative value they might have is substantially outweighed by the danger of unfair prejudice to EMC. Fed. R. Evid. 403.

e.      **Reference to Civil Penalties Imposed on EMC for Administrative Infractions.**

On February 5, 2004, Coast Guard marine inspector James Metza conducted an inspection of the EMC-310, another tank barge in EMC's fleet. In reviewing that barge's certificate of inspection, Mr. Metza noted that the EMC-310 had missed its last scheduled inspection. Because of that omission, the Coast Guard undertook a review of the records of every vessel in the EMC fleet, more than thirty vessels in all. That comprehensive paperwork review revealed several additional minor administrative deficiencies.

On August 12, 2004 the Coast Guard initiated administrative civil penalty proceedings for the alleged deficiencies discovered as a result of its fleetwide review. Before a hearing could be held, however, the cargo in the EMC-423 exploded and all of EMC's employees were consumed by the resulting salvage effort. A hearing finally was conducted on March 14, 2006.

Several of the alleged violations were dismissed, one record infraction related to the EMC-423 was reduced to a warning, and the proposed penalties associated with infractions involving other vessels were substantially reduced. EMC suspects that the United States will attempt to introduce evidence of these administrative 'paperwork' infractions, unrelated in any way to the explosion aboard the EMC-423, in an attempt to disparage EMC at trial.

To be clear, none of the alleged documentation infractions in the EMC fleet are in any way relevant to the facts of this case. Moreover, even if the documentation infraction charged against the EMC-423 somehow was related (which it is not), that violation resulted only in a warning being issued. Because the risk of unfair prejudice to EMC greatly outweighs whatever slight probative value these civil penalties might have, any reference to them should be excluded from trial. Fed. R. Evid. 403.

## CONCLUSION

WHEREFORE, for the reasons stated herein, EMC respectfully moves this Honorable Court, *in limine*, for an Order excluding from evidence at trial: (1) the "Propane Torch" identified as Plaintiff's Exhibit 3; (2) the standpipe and section of heat trace line from the EMC-423, identified as Plaintiff's Exhibits 1 and 2, respectively; (3) any testimony based on or derived from the United States Coast Guard's Marine Casualty Incident Report including the photographs, notes, exhibits, figures, tables it contains; (4) any testimony by expert witness John DeHaan concerning opinions first disclosed in his untimely rebuttal report; (5) any references to Alex Oliva's use of a propane torch aboard the EMC-423; 6) any testimony concerning statements allegedly made by the LISA E's crewmembers the night of the explosion; and 7) any reference to civil penalties imposed on EMC for administrative infractions.

23

Respectfully Submitted,


/s/  Christopher A. Abel
*An Attorney for Egan Marine Corporation*

Dated:  August 30, 2011

David H. Sump (*Pro hac vice*)
Christopher A. Abel (*Pro hac vice*)
TROUTMAN SANDERS, LLP
150 West Main Street
Suite 1600
Norfolk, Virginia 23510
(757) 687-7775 (telephone)
(757) 687-7510 (facsimile)

Christopher H. White (Bar No. 6280031)
TROUTMAN SANDERS, LLP
55 West Monroe Street, Suite 3000
Chicago, Illinois 60603
(312) 759-1920 (telephone)
(312) 759-1939 (facsimile)

David R. Anderson (Bar No. 0044954)
EGAN MARINE CORPORATION
15200 East Canal Bank Road, P.O. Box 669
Lemont, Illinois 60439
(630) 739 0947 (telephone)
(630) 739 4455 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

       I, the undersigned attorney, certify that on this 30th day of August, 2011, I caused a true and complete copy of the foregoing pleading to be served on the following counsel by electronic means through use of the Court's CM/ECF system:

Robert E. Kelly
Douglas M. Hottle
Torts Branch, Civil Division
U.S. DEPARTMENT OF JUSTICE
P.O. Box 14271
Ben Franklin Station
Washington, DC 20044
E-mail: stephen.campbell@usdoj.gov
E-mail: robert.kelly@usdoj.gov

Eric Pruitt
UNITED STATES ATTORNEY'S
OFFICE
Northern District of Illinois
219 South Dearborn Street, Suite 500
Chicago, Illinois 60604
E-mail: eric.pruitt@usdoj.gov

**Attorneys for the United States**

                                                      __/s/ Christopher H. White_____
                                                  *An Attorney for Egan Marine Corporation*

David H. Sump (*Pro hac vice*)
Christopher A. Abel (*Pro hac vice*)
TROUTMAN SANDERS, LLP
150 West Main Street
Suite 1600
Norfolk, Virginia 23510
(757) 687-7775 (telephone)
(757) 687-7510 (facsimile)

Christopher H. White (Bar No. 6280031)
TROUTMAN SANDERS, LLP
55 West Monroe Street
Suite 3000
Chicago, Illinois 60603
(312) 759-1920 (telephone)
(312) 759-1939 (facsimile)

25

David R. Anderson (Bar No. 0044954)
EGAN MARINE CORPORATION
15200 East Canal Bank Road, P.O. Box 669
Lemont, Illinois 60439
(630) 739 0947 (telephone)
(630) 739 4455 (facsimile)

1118562v1